Case number 22-1076 Fontenham US, LLC Petitioner v. United States Food and Drug Administration Mr. Prince for the petitioner, Mr. Coyle for the respondent. Good morning Mr. Prince whenever you're ready. Good morning Your Honor. Thank you and may it please the court. FDA denied Fontenham's e-cigarette applications in this case for an alleged failure to satisfy the tobacco control acts appropriate for the protection of public health standards. But FDA notably never concluded that Fontenham's products pose any actual public health problem, notwithstanding that Fontenham's tobacco flavored products had been on the market for many years. Instead they denied the application for alleged data gaps. But those data gaps were solely the result of FDA's flawed review process. Before getting to the merits though, I would like to briefly address the elephant in the room, which is the effect of the court's, or FDA's, denial of supervisory review late breaking last Friday. We filed a new petition for review on Monday, which the court graciously acted on quickly and consolidated with our original petition for review. We apologize for the last minute filings of course, but it was done out of necessity. But the upshot of that flurry of activity is my understanding is the parties now agree that the prematurity concerns raised by the government in its response brief are resolved. And that is consistent with this court's past precedents in the Hummus County and Columbia Falls Aluminum, where a very similar situation arose and the court consolidated to resolve any prematurity concerns. As to the impact of the supervisory review- problem with your first petition, do you? We do not, Your Honor. We stand by the arguments we raised in our reply brief. Having now done a very deep dive on these cases, I think a very interesting law review article could be written about the interaction of the incurably premature doctrine the Supreme Court's recent repeated cautioning not to read jurisdictional requirements into the statute where Congress has not put them in there. And this court's recent clarification that finality in many cases, in fact, non-jurisdictional. But I don't think the court needs to address that in this case because either we're right or the government's right. So this court has jurisdiction to review the marketing denial order. And in fact, a very similar situation came up in the case I'll provide, which we haven't provided to you yet. Collins v. National Transportation Safety Board, 351 F3-1246, from 2003, where the court was faced with competing petitions for review in an incurably premature situation. And it said, we just don't even need to decide this because either way, we have jurisdiction and we would submit the same. It does seem that it would be helpful to have a rule, though, for other companies in a similar position with the FDA. Maybe that's not your concern. I don't dispute that. And protective petitions are filed in this circumstance frequently because I think the law is fairly unclear on it. But again, it is a fairly complicated issue and requires resolving a bunch of kind of late-breaking principles of law. So I would submit you don't need to do it in this case. As to the impact of the supervisory review denial itself, in Fonum's view, it has no impact on this court's review of the merits. Under this pre-report's decision and locomotive engineers, whereas here are requests to the reconsideration was focused on error in the underlying order, the agency's order denying that request is unreviewable, unless the agency's formal disposition is to modify the order. That's true, the Supreme Court said, and this court has also said, even if the order refusing reconsideration discusses the merits of the claims at length. Here, all the agency did was decline to disturb its underlying order. The supervisor said, I concur with the decision to issue the MDOs and thus deny your argument. So there was no reopening and issuing a new order in this case. It's unreviewable. Turning to the merits of the marketing denial order that actually is an issue in this case, I'd like to start, unless the court has a different preference, with our structural arguments which we believe caused FDA to simply misapply the statute. Simply put, FDA has ignored all of the advance notice requirements that Congress put in place in the statute. Congress specifically set forth in 387JC the four criteria that FDA is to consider when evaluating an application, including whether the product is appropriate for the protection of the public health, and including whether it complies with manufacturing standards that FDA is obligated under the statute to promulgate. The delineation is important because Congress directed that specific problems be addressed in very specific ways, and the manufacturing problem is especially relevant here, because I think it's undisputed in this case that FDA denied our application for manufacturing reasons. Deficiency two, deficiency six, these are literally in the heart of what would normally be put in an FDA report. Can I give you an interpretation of the statute and you tell me why it's wrong? You look at A, and it says the FDA can do individual adjudications where they balance, they figure out, is this product good enough for public health? Then B and D in particular allow the FDA to promulgate rules using notice and comment with regard to manufacturing and tobacco product standards. The benefit of doing that to FDA is that when there is an adjudication, which is going to focus on the balancing in A, FDA won't even have to give an explanation if the tobacco product has violated one of the rules promulgated under B and D. So the FDA can do it one of two ways. They can either do it all under A and explain themselves, or they can promulgate under B and D, and then if B and D's rules are violated, when they apply A, all they have to say is, you didn't follow the rule that we promulgated under B and D. I hear that, Your Honor. I have a few responses. One is there's always overlap between the prongs in these cases. Justice Scalia's opinion in RAD LAX, for example, there was undoubtedly overlap between the prongs. What the court said is, look, when there's overlap and one of the provisions is very specific and Congress has sort of gone out of its way to articulate a certain process, that needs to be honored. Here, the manufacturing provision in particular, it makes eminent sense that Congress would want manufacturers to have advanced notice of things like what they need to test and what documentation they need. The lack of that is why we have such a fundamentally broken FDA review process. But it would be very odd for Congress to have said, okay, you must promulgate these manufacturing standards. By the way, you need to consult with technical experts when you do it. You need to give manufacturers grace periods to comply. All of these are to benefit manufacturers, not FDA. So I don't think the provision can be read as essentially conferring on FDA discretion to do anything. It's avoiding procedural rights. Counsel, let me try a simpler proposition. What, if anything, tell me, what does the FDA say about the methods used in or the facilities or controls used for the manufacturers? Well, what does it say that that means or what is it? What is in their decision? Did they say you're saying they rested on that inappropriately rested on B considerations when rendering a decision under a what did they say about B considered? So, so a lot of it. So, for example, many of the deficiencies are based on on the methods and the documentation we have to map out our product characteristics, the testing against those product characteristics. For example, environmental controls, the humidity and storage rooms. This is all within the heartland of manufacturing regulations. But it seems to me they faulted you time and time again for failing to produce something that they to comply with anything in B, but their failure to file information on which they could make a decision relating to what B is intended to do is set up the processes and procedures that you need to follow to get to a position where FDA can make a decision. I would point your honors to the medical device context in the same statute, which is what Congress modeled. And their FDA has hundreds of pages in the Federal Register describing what you need to do. You need to keep controls for environmental control. You need to do various or you need to have various sort of processes and procedures for stability issues. That's like we are supposed to know to do that so that FDA can then reach a decision based on the data that we know we have to collect. And I don't even read FDA's brief, by the way, to be opposing our views that, for example, deficiency to can could be considered under beat. And I think FDA's argument is different. I think they conceded it. I think FDA's argument is different. Their argument, as I understand it, is notwithstanding the overlap. We're allowed to do it under the public health prong as long as it raises some conceivable public health issue. But there's two problems with that. The first problem is that manufacturing standards Congress put right in the statute also address public health So there's a much more specific solution as to manufacturing for public health issues that Congress has told FDA to use. And again, I mean, it's to me, this case is indistinguishable from RAD LAX. It's there's an overlap. The agency would prefer to use one criteria, but the other criteria is more specific. I think you're correct about the agency's view of the relationship between B and A. Whether you agree with it or not, I think is the position correct. That's the position they've taken. Maybe that straightforward reading makes it even easier. Well, I was just going to say that then if that is the agency's view, I submit that they have misapplied the law and that orders need to be vacated for the agency to apply the correct legal standard. And if it thinks some of these on reflection are not actually manufacturing issues, it's obligated under the APA to clearly explain why. Mr. Prince, I think one of the, I'm sympathetic to your argument that, you know, there are these four different reasons that they can deny the approval of an application. And so you can't necessarily put, you know, one of these wrongs into another one. I think one of the difficult things about this statute is the approval authority allows FDA to require applications to have fairly specific content, right, to provide information on a whole host of different subjects. And so I think you need to have some account of how that content maps onto the requirement to have tobacco product standards or manufacturing standards. I think that that interrelationship is very important to understand. I think so too. And I think it's not a perfect overlap, but I think the application criteria, which Congress does spell out, actually map on pretty closely to the denial grounds. There's, I believe, one that maybe could fit into multiple categories, but otherwise it's like literally using the same language, right? Submit information about the methods and controls for manufacturing. And then there's a separate version of the statute that regulates. So FDA did point to that relationship in their brief, but I just don't, I just don't think it works. You know, it's creating super fluidity, as Justice Scalia said. Well, so how do they, how, if they don't do standards and yet their applications include things about, say, the methods and content of these products, how are they supposed to evaluate the things that are required in the application in the absence of standards? Well, I don't think, I don't think they can do that consistent with the statute. I think if they're going to deny an application for manufacturing issues, things that would fall within B, they need to first promulgate a standard because by definition, the statute says the ground for denial is a failure to comply with the regulation. The product standards argument is admittedly a little bit more difficult for us because that already is phrased in more permissive terms. But let's, let's suppose there is no statutory violation. Disagree with us on the statutory violation. FDA still would need to give very clear, as I sort of said, reasonably certain to a good faith regulated entity, notice of what the manufacturing requirements are. And we submit to do not have a reasonably certain notice of any of these requirements. And if you disagree with us on that, I would just invite the court to compare the high level of generality of the deficiency letter, which is frankly difficult for me to even understand in parts with the clarity of the rejection letter where FDA is imposing very specific requirements for very specific kinds of testing, telling us exactly, you know, the kind of data we would need in many circumstances. So how does it work in practice? I mean, the FDA says that a manufacturer can, can file as many amendments as it chooses to an application in order to comply with a deficiency letter. So how does that work in practice for the ultimate denial? Yes, Your Honor. So I think it helps to help to take a step back and look at the other regulatory regimes that FDA is a broad statutory standard. And normally you're having meetings with the agency. There are many, many rounds of these kinds of deficiency letters. The agency publishes product specific drug guidance, device guidance. These are the type of environmental controls you need. So the regulated entities sort of know what they're aiming at. And then you're meeting with the agency throughout the year long process. You know, is this study design acceptable? Is it not? And, you know, I submit here that FDA, you know, basically implemented for tobacco or regulatory regime without doing any of the prerequisite work to put in place a regulatory regime, but nonetheless, that's what it did. And the solution is that FDA needs to do the same kind of iterative process to make sure that regulated entities are getting fair notice. You know, really all we needed here was the opportunity to respond to the, to the rejection letter. And we couldn't resolve the vast majority of these things. It's just information that, you know, you didn't provide this one data point and we need it. That's all we needed to do. What about, I'd like to talk about deficiency five, about the flavored products. So with respect to deficiency five, I mean, the reasoning that the FDA gives for that deficiency is very similar to the type of reasoning that this court approved in prohibition juice last summer. And so I'm wondering how your challenge to deficiency five, how would you distinguish that from the type of reasoning that this court upheld in prohibition juice? I actually think prohibition juice is a nice comparison because the standard the FDA ordered to be applying there was different than the one it's purporting to apply here, which kind of shows the shifting standards and the lack of notice. But prohibition juice was fundamentally about whether FDA is allowed to do the sort of a comparison. Do you have to show not only that your product has a health benefit, but that it has a health benefit over, you know, tobacco. We're not disputing sort of that aspect of it. And we submitted longitudinal studies, unlike the prohibition juice folks, which we think demonstrate that. But here FDA is sort of doing, it's a different kind of challenge. Our challenge here is grounded in cases like Pearson and City of Vernon, which the agency has set up a standard where it wants something quantitative in like the numerator, right? What is your benefits to adults? But the denominator is significant risk to youth, which nobody knows what it means. It's impossible to actually do like any comparison to tell whether you overcome the significant risk to youth because it means whatever the agency wants it to mean. And this order seems to say you can't do the only thing that will overcome it is a device access restriction, which nothing in the history of the tobacco control regulation has ever been required. And FDA admits is novel and rare in this record. The agency can't just have a standard that is, I know what I see. This court has held that squarely and we submit that's effectively what they've imposed in deficiency five. I see over time. If I can direct you to deficiency four without saying anything that's your seal, what would you say to this argument? Uh, if you're going to use data from a previous product or new product, you have to tell the FDA why every new aspect of the new product is immaterial. And with regard to one aspect of the new product, you did it. So we did, we, we understood the request to be to justify the product changes that we sort of reasonably thought could lead to a problem. And that's, that's what we did to the agency. The agency knew about that one specific product design that you're talking about. It didn't specifically ask us a question about it. We personally did not think it was the, the company did not think personally was relevant. And so it didn't address it, but we'll go ahead. I'm just going to say, but, but it's fine. If the agency is, is concerned about that, it all it needed to do is ask us a specific question about it. And we would have, we would have pulled the agency. Right. And I'm pretty sympathetic to the last thing that you said. If I were running the agency, I have no doubt I would have done that. But the question is whether APA and the statute here require it. And what they said in the deficiency letter is provide evidence to show that the changes do not matter. Change is plural. And you didn't address every change. All I can say, your honor, is we addressed the changes that we, that we thought we were relevant. And what would you say to the argument that they didn't ask you to address the changes you thought were relevant. They thought they asked you to address all the changes. It would, I would say the agency needs to speak so that it's, we know with, with reasonable certainty what the requirement is. And that's not what we took that, that's not what we took required to me. And I would also say, your honor, that that deficiency alone is not a sufficient grounds to support these marketing denials. So that's my last question. What's your, what, assume I'm with the FDA on the merits of deficiency four, and I'm not with them on anything else. What, tell me why deficiency four isn't enough for us to deny your petition. Because the agency has not purported to claim that's an independent ground for one. Again, it needs to speak with, I think, with reasonable ascertainability that that's what it was intended to do. And that's not what the decision maker did here. It's, it's also just fundamentally inconsistent with the test that the agency purports to be applying when it's doing a public health analysis, which is to weigh all the risks and the benefits contained in the application. These are just statements FDA's considered the application as a whole. FDA declines to assign specific weight to any evidence. So if mere uncertainty about that one product characteristic, which by the way, FDA never actually says is likely to happen. They just say, oh, we don't know. It's a little unclear. They would have to say and explain why that outweighs all of the numerous benefits that our products have that are, that are stated elsewhere in the record. And it hasn't done that. I'll also note, your honor, that I think deficiency four, at least in terms of, you know, what we're required to do to manage product changes and document and test against would also typically be considered a manufacturing regulation issue under FDA's other regulatory. You said one thing toward the beginning there where you said the FDA never said this was an independent ground, but they said would be needed. They said, this is needed. Sounds like would be needed to resolve the deficiency. I do not read them to be saying that the deficiency itself is, is an independent ground. And we're not saying by the way that FDA, it's inconceivable that FDA could ever have an order where there are multiple, you know, if your product blows up in somebody's face, the FDA could clearly say, like, yes, this deficiency alone is so serious that it outweighs any possible benefit. But, you know, uncertainty about a tiny little thing that changed in our product, it's, it's a real stretch that the decision maker would have. So, so as a court, are we supposed to sort through that? If we think some deficiencies are reasonable and supported by the statute and some are not, I mean, how do we decide? I don't think that's your role just in generally under normal administrative law, but also in particular where the agency is applying a balancing test, you know, that comes up in all sorts of other areas of the law, sentencing issues. I mean, if the agency has misconstrued the statute, if it's applied factors, Congress didn't want it to consider, needs to go back to the agency to redo. Do you think that the denial letter contains at least a separate distinction between the flavored products and tobacco flavored products? I do. And I think, I think, you know, the agency's best arguments for independent ground would be on deficiency five in part, because they can say, hey, we looked at this. We rejected in prohibition juice. Why wouldn't we reject it here? So that's FDA strongest argument. I would submit that FDA has said you need to conduct a product specific balancing of the risks and the benefits. And, you know, our record of benefits is not the same as in prohibition. Counselor, a moment ago, you referred to the many benefits shown in the record. Remind me just briefly, what are you referring to? The major benefit is the significant reduction in harmful and potentially harmful compounds relative to combusted cigarettes, which is sort of the gold standard. Doesn't that depend upon switching smokers from combustible to vaping? Well, yes, I suppose there does. The agency said that's not documented in a sufficient way to amount to anything. But your offhand references to all these benefits is one of the very things being disputed. I don't I don't agree that the agency said that, your honor. I think they said specifically with regard to flavored products. We we hadn't demonstrated sufficient efficient switching. But they certainly said that and that did not say something comparable to me with regard to non flavored. I do. I do not believe so. Thank you. We'll give you some time. Thank you. Good morning, Mr. Quayle. Good morning. May it please the court, Eric Quayle for the government. For six independent reasons, FDA reasonably determined that FONTM didn't meet the statutory public health standard to market its e-cigarettes, many of which come in fruit and dessert flavors attractive to kids. As FDA explained, despite the deficiency letter and the industry guidance, FONTM provided inadequate information about its products health risks. This included information about emissions of substances like lead, formaldehyde and nicotine, the risk of burn injuries and the level of toxins and bacteria in the products over their shelf life. Before jumping to the merits, I would like to briefly address the effect of the decision on the supervisor review request. We've requested the opportunity to provide supplemental briefing on that issue. We got the other side's 28 day letter on Monday evening. And so we would request the opportunity to to provide the court with additional briefing. We do think that decision is properly before the court and can be considered at this state. What would be what would be the point of the supplemental? To explain what the effects of that decision are on the issue before the court. Are there any? Yes, we do think there are. Other than the finality question? Yes, besides the finality question, for example, the questions about whether the grounds are independent. There are seven, I believe, separate pieces of support for that in the the supplemental decision. We think it was clear from the original decision, but there's any doubt would be eliminated with the supplemental decision. There are also some additional arguments that they have made, for example, in their their letter earlier this month, referencing the Office of Special Counsel findings to see how FDA passed on that that would require the court to consider the supplemental decision. Would it work if if the first denial letter was incurably premature? I mean, how would this work in practice? I mean, the statute says that a party has 30 days to seek judicial review from the denial of an application. And then so in this case, you know, the quantum sought, you know, filed a petition for review within 30 days, and then it sought an administrative appeal after that 30 days, right? So so how does this work? I mean, would with a 30 day timing for seeking a denial of an application be told if there was administrative appeal pending? Is there some time limit for filing an appeal? I mean, the FDA's process is entirely informal. Perhaps there's some guidance indicating some timelines for filing an appeal. We were unable to locate any. I mean, how would this work in practice? I mean, if if you could just toll indefinitely, then the 30 day timeline in the statute would become irrelevant for filing a petition from the original denial. I'd like to press my answer by saying I don't think the court needs to decide that in this case. I think we've agreed the new petition is properly presented here. Right. But your position is that the first petition was incurably premature. And I presume the agency may take that position in later cases. And so I just want to understand how the agency thinks this would work, given that the appeal process is not based in the statute. I'm not aware of any source of regulatory or even guidance that sets out the appeal process. I mean, how do those two things? I mean, how does the appeal process interact with judicial review, which is clearly specified in the statute? By analogy to the Hobbs Act, the Hobbs Act, a filing of a petition for reconsideration before the agency tolls the statutory time to come to court and file a petition for review. We think that would also apply in this in this circumstance as well. Would a person have to file the administrative appeal within 30 days? Could it be at any time after 30 days? I think the petition for the reconsideration request were filed after 30 days and there were also not a petition for review in this court within the 30-day period, then there might be a timing problem with coming to court afterwards. It might depend on whether the decision on reconsideration resulted in a new denial order or simply simply, you know, referring. But your answer just sort of halves, which is why I think the court, this might not be the case that it would be the best vehicle to decide that question. Think of it this way and tell me what you think. If the if the first petition is filed from an order that is currently final, then someone seeks reconsideration of that order, essentially making the first order non-final. We're waiting for the final order. Whatever the final order says, whether it addresses the merits or not, that would then be the final matter subject to a new petition and the new petition would be added. Yes, we agree. Thank you. How does that intersect though with the Supreme Court's ICC versus Brotherhood of Locomotive Engineers case? Again, we would like the opportunity to brief this. We just got this that Brotherhood of Locomotive Engineers even applies to this circumstance. But even under Brotherhood of Locomotive Engineers, there is a distinction between a request for reconsideration that just rehashes the prior arguments and says the agency got it wrong. The denial of that is not typically subject to judicial review. And a petition for review that presents either new evidence or changed circumstances, the denial of which is subject to judicial review. And here, there are multiple examples of new evidence that FONTA presented in the agency reconsideration request, like the Office of Special Counsel report that just came out last month. That was never presented in the original one. That's something that the agency just had a chance to look at now. And so we do think even under Locomotive Engineers, that would be subject to review. You're saying the records differ. Exactly. The first petition dealt with one record. The second petition was somewhat different. Correct. Under your theory, what would stop the FDA from just sitting on the reconsideration request in order to preclude judicial review? So two responses. First of all, there is no requirement that a petitioner seek reconsideration before FDA. And many, many manufacturers have come straight to the Court of Appeals without seeking reconsideration. And there's also no suggestion, no allegation that FDA was anything but diligent here in resolving the administrative appeal. With respect, I think I interpret you to say nothing. Nothing would stop the FDA from sitting on the reconsideration request in order to preclude judicial review. I think the agencies, there's no, in the agency regulation, there's no time limit, for example, limiting the agency's ability to decide, requiring it to decide within a particular time. But there's also nothing to prevent an applicant who is frustrated with the pace and withdrawing the application for supervisory review if they so choose to do so. But we've had situations where, and this is typically after a rematch, but it would be the same idea, the agency doesn't do anything and the party then seeks a, under the All Writs Act, an order imposing a deadline, an immediate deadline on the agency. And I think the cases will show that it takes about 18 months before we will agree that the agency has been too sluggish. I'm not familiar with that. Again, we got this letter on Monday night. We would like the opportunity, if the court is interested in this, to present a supplemental briefing on the issue. If I can turn to the merits, and based on where the questioning went earlier, I'd like to start with the statutory argument. I have a question about that. It's the same question I was pursuing with your opposing counsel. What did the agency say to the effect that the methods or controls used for manufacturer etc. etc. do not conform to the requirements of 387 FE? I don't believe that that was the ground for the basis of the denial order here. The denial order here is... The agency said nothing about that, correct? Correct. The agency determined that this application... Said they didn't provide enough information for you to make a determination under A. That's exactly right. Thank you. I'd also point out that the Act requires FDA to adjudicate marketing applications. The Act says that FDA is to consider a broad range of information when doing so, including about the product's health risks and manufacturing processes. And the Act requires FDA to deny an application when the manufacturer doesn't make the required public health showing under the appropriate for the protection of the public health process. So Mr. Powell, maybe you can speak to that. What is the relationship between the content that's required on the application and how the FDA measures whether it's appropriate for the protection of public health, right? So in a situation where the FDA has not promulgated tobacco product standards and has not promulgated manufacturing standards, what do they do with this information on the application? I mean, what is it fair to ask manufacturers to demonstrate in these applications in the absence of any notice about what the standards are? The statute itself puts the burden on manufacturers to make the showing that their products are appropriate for the protection of the public health, meaning the benefits outweigh considering the risks and benefits to the population as a whole. And the agency has, in this case, explained how each of the shortcomings in FONTM's application affect the public health in the end of the day. The emission of substances like lead, formaldehyde, nicotine. Those are very granular things. So the statute for the adequate for the suggests that there are other prongs for denial where an application fails to meet a manufacturing standard or a tobacco product standard. So I guess I'm not sure why FDA thinks that it can effectively impose those standards under the broader public health umbrella. The agency is not imposing those standards under the broader public health umbrella. We agree with Judge Walker's questions earlier that manufacturing requirements and product standards, you know, allow FDA to deny an application solely for that ground, irrespective of the effects of that particular product on the public health. They're two separate prongs of the statute that FDA analyzes. Well, they are. They are two separate prongs. But I mean, the statute is very specific. I mean, it doesn't seem. I mean, I know FDA denies that they're, in fact, doing this. But if they, through the public health prong, say you haven't met a certain standard of emissions or other controls, I don't want to mention any of the sealed material. You know, at what point can they do that just under the general public health prong as opposed to through the notice that's required by promulgating a standard? I mean, this is the statute is very granular in what it requires for FDA rulemaking. You know, there are very specific requirements for the type of notice that must be given for the length of comment periods or consultation with the expert advisory committee or delayed effective dates of standards. And I mean, that is that is very specific guidance from Congress about what FDA is supposed to do. So so it does seem difficult then to impose those standards effectively through the public health prong. The two responses, first one about this specific denial here and then about the effect of the statute more generally. The shortcomings here were that quantum didn't provide adequate information about its products, health risks to allow FDA to make the ultimate public health finding under that information is being judged against some type of implicit standard that FDA is considering. Right. You're saying the information is inadequate for us to evaluate against some standard, a standard that has not been stated in advance through rulemaking that Congress required. It is not here. The defects here were not that it that the application failed to show that the products met a particular manufacturing requirement or product standard. For example, the micro the microbial stability data didn't exceed a certain level. That was not what the deficiency was. The deficiency was quantum didn't provide the required information so that FDA could evaluate it all and conclude that the risks were not outweighed by the benefit. But that information goes to some specific way that the FDA is going to evaluate the benefits and risks. So you can say it's a failure of information, but but it's failure of information to make a determination under some standard. Right. I mean, because the information is not just information in general, it's information to evaluate something specific. And the specific is the statutory requirement that the product be appropriate for the protection of the public health, considering the risks and benefits. And it was relevant to the product's risks, the product's risk to its users. The other response, more generally talking about the statute, this provision still had independent effect. And I'd point out that the pre-market adjudication process applies only to new tobacco products, that is products that were not on the market in 2007. If FDA wants to impose a requirement on a product that's not a new tobacco product, like a cigarette that was on the market in 2007, then manufacturing requirements or product standards would be the way to do that. And then they're also just the focus of the two provisions is different. One is looking at the product specific effects on the population as a whole. That's what adjudication is, whereas the manufacturing requirements and product standards are looking at the effects of imposing a requirement on a broader class of tobacco. Is there any limitation on what the FDA can consider under the public health prong? Is it just sort of anything it thinks may be relevant to the risks and benefits of these products? I think the FDA has to explain how the particular information is relevant. And FDA did so here, talked about why the level of microbes, level of toxins and bacteria can change in a product over shelf life and how those can cause cancer and respiratory problems, for example. I think FDA has to connect it to the bottom line public health standard, but the statute itself tells FDA that there's a broad range of information that it should be considering in doing that. Has FDA promulgated any tobacco product standards or manufacturing standards under the statute? I believe there is a, I don't know the latest status, but there is a product standard that would prohibit menthol in cigarettes, menthol flavor in cigarettes. I don't know the manufacturing requirement. There's a proposed rule on the unified agenda. It's been ending with OMB since May of last year. I don't know any more information than that. So just two. I don't know. There might be more product standards. I don't know. I don't know one way or the other. Can I ask about, well, first I want to ask what the FDA meant in the order when it used the word need. So for example, it describes information about the temperature and humidity in the clean room as needed. Did the FDA mean that information is so essential that it will deny quantum's request without it? Or did it mean that information would be, maybe not essential, but really helpful to the FDA's consideration of quantum? I believe each deficiency on its own is independent. So all of the information under a particular deficiency would be needed in order to meet the standard is what is what FDA said here. I think you can also see that from the. So quantum says that if that's the case, that that would be arbitrary and capricious in itself to say that. Just simply leaving out the temperature of clean room. Would justify denying quantum's application. That was not the sole basis of deficiency three. It was not just temperature and humidity. It's the entirety of deficiency. Three is the independent ground that included information about accreditation certificates for testing. I think I follow. I'm following. And I think what you're saying is when the word needed was used with regard to the temperature in the control room, FDA didn't mean it's that information is needed in order for quantum's application to be granted. It may be meant it was needed in order for deficiency three to be satisfied. I don't think that's right. I think the marketing order itself says that that information would be needed in a subsequent application, not that. I'm going to make a stronger showing on other in other areas to overcome that. And now we're back to my question, which quantum raises is brief. Wouldn't it be arbitrary and capricious for the FDA to say? The information about temperature in the in the in the room is so important to us that it's it's essential and we're going to we're going to deny your application if you don't give some. Wouldn't that be arbitrary and capricious? I don't think it necessarily would be. That's not the question here. There's more to deficiency three includes. No, I know. But I'm making a hypothetical. I don't think it would be unreasonable. Temperature can affect the growth of all sorts of substances like bacteria, fungi, mold. But that's not the sole basis. I would also point your honor to the technical project lead review pages 858 and 859. FDA explained that without each piece of piece of information, FDA could not reach the bottom line public health conclusion. Those are internal documents, right? I think they can properly be considered for a couple of reasons. I pointed to J816. This is the first page of the technical project lead memo. It's issued on the same date that the marketing denial order is. And at the technical project lead memorandum saying he concurs with the recommendation and the basis for the recommendation. So I think it's properly considered as part of the agency's decision here. It's not a post hoc rationalization. It was decided the same day as simultaneous with the marketing. Council, are you familiar with the GMP regulations for drugs? I'm not familiar, your honor. I apologize. Assume that I agree with you about the merits of deficiency four. Assume I disagree with you about everything else. All the other deficiencies. What's your best argument for why we should agree with the FDA when it said deficiency four is alone enough to justify denying the application? The two record places I would point you to are J858 and 859, where FDA explained that without the information in deficiency four, FDA could not conclude that the products were appropriate for the protection of the public health, which is the ultimate statutory requirements that FDA has to do. I'm sorry, one more. We also think that the decision on the supervisory review request makes this crystal clear. Pages three, four, eight, nine, 10, or not eight, three, four, nine, 10, 12, 17, and 23 and 24. I think seven separate places there. It's clear that the grounds It's not surprising since that was done after this. So where that was precisely the issue that wasn't in the initial order, it's not saying that. But the agency considered the arguments there and said, you know what, we think you're wrong, but even if you were right, we would come to the same bottom line decision. Let me ask about deficiency two on the merits. J617 is under seal. I'm just going to talk about paragraph. I'm just going to say it's the second full paragraph. J617. Second, full paragraph for the second, the second starts with all the. Okay, why isn't that good enough to justify that? Fontans test tests reflect the use patterns of the. There's a distinction between the length of puff and the number of puffs. The deficiency that I found was on the number of the justification for the number of use the paragraph you're referring to is about duration. It looks like number of puffs. Oh, I see. I see. Okay, I'll take a look at it more closely, but fair enough. And then my last, my last question is on. Put note 3 in the denial letter, just public. Yeah, 475. And makes this argument pretty. Clearly, and it's in its briefing, it says. Here you are, and just categorically imposing a requirement. For device access restriction when it comes to flavored. And you can't just impose a categorical rule like that. When absent knows the comment, when you say you're doing a balancing test, and you never told us about this category before. So, do you agree with quantum that. You are imposing an absolute requirement for flavor to have. No, we do not. So why why why is why does put note 3 not say we're talking solely on the risk side of the equation here? This is a risk benefit balancing test. And we're only looking at the risks to you and what FDA is saying is that it's got a lot of experience with the traditional sales access and marketing restrictions, like, requiring somebody to show ID when they buy it by 1 of these products. And FDA's experience shows that that's not good enough to lower the risks. Because people get these from friends kids get these from their friends, not from buying them at convenience. And so the risks are going to remain high if those traditional types of. Of sales access and marketing restrictions are the only thing that's proposed and there may be a way to lower those risks. If you have device access restrictions, like, requiring a fingerprint to unlock it the way you unlock your phone. But FDA considers those in each separate application and. Enacted a requirement to have those, but that's just the risk side. And FDA takes a look at the benefits to potential benefits to adult smokers and says, if you don't have the traditional. Sales access and and marketing restrictions. You're going to have a high risk, so you need to show an even higher benefit to adult smokers and that's where FDA looked at the specific evidence here and identify the shortcomings of each study that quantum submitted. The inadequate sample sizes, the mixed results, the. At lack of a showing that their products were going to be. More beneficial to adult cigarette smokers and tobacco flavored. So, would it would it be fair to say that unless quantum. Can produce evidence that's never been produced. Before that, the benefit side is higher than we. That then quantum has to do a device access restriction. Otherwise, the risk side is always going out with FDA looks at each. Application individually, I don't think there is a blanket rule that would. Always require anything or, you know, other than the benefits outweigh the risk. But FDA has never improved a flavored. Application a flavored product. That's correct there are still flavored applications and name with FDA look at each of them individually looks at the risks on 1 side of the benefits on the other. I do believe there are. You know, attempts to provide the types of. Robust and reliable evidence on the benefit side and FDA is still considering those in each instance. They're considering applications that present randomized control trials and longitudinal studies. There was none here there was a submitted a plan to conduct 1 of those types of studies and didn't provide any of the results of data. So explain that. That wasn't FDA explain, you know, so it's a general course has been to proceed as you said, individually through adjudicating. These applications, I mean, Congress gave FDA the authority to regulate tobacco products, but arguably the tobacco control act is like. Is it very detailed and comprehensive negotiated deal between protecting public health and the interests. Of manufacturers, and the interest of manufacturers is largely reflected in all of the rulemaking requirements that are imposed on FDA. So, if all of these tobacco. Product concerns are adjudicated through the general public health. I'm just wondering how that is consistent with this very careful. Grant of authority that Congress gave to the FDA. I mean, I think it's just sort of like, stepping back, you know, I've read through the whole act carefully and I do think that this general approach is hard to square. With what Congress did here very clearly and plainly the tobacco control. I think that the 2 provisions have independent effect. I talked about the new tobacco product versus. Not I also agree with judge Walker's questions earlier, which suggested that, which indicated that. If FDA does go that rulemaking route, then it can deny an application solely for the failure to. To satisfy the particular rule without. Without respect to the products effects on the public health separately. So the 2 independent basis, but that suggests that the rulemaking is just a convenience to FDA, but that's. That's clearly not the only purpose of rulemaking. The primary purpose of rulemaking is to allow for public input to provide notice to provide some clear standards that that entities can attempt to meet. And that's the main purpose of notice and comment rulemaking. Yeah, I agree. It's not a convenience to the agency. It's for the, it's for the public and for, for private companies who are trying to. To market these products, it certainly is, but once the rule has gone through that, then the failure to comply with that, what would be an independent. Independently sufficient reason to deny an application. The public health standard is a separate ground to deny an application. You have to. Consider the risks and benefits to the whole population. That would come from marketing that particular product. So, your approach is to say, I guess. That the agency may proceed by adjudication rather than by. Not only may the act requires the agency to adjudicate marketing applications, and it requires the agency to deny an application. If it doesn't make it wouldn't work if the statute requires you to issue a regulation. This is what's being applied. They're separate forces of authority. I think there are still the requirement that the agency adjudicate. Marketing application there, I mean, you say that they're separate, but they're also connected because 1 of, like, some of the grounds for denial of an application turn on whether the application meets. Regulatory standards that the statute seems to assume. FDA will promulgate, so, I mean, they are connected. And the language of the content of the applications is phrased in terms almost identical. Or in many cases, in fact, identical to the statutory provisions requiring FDA to do tobacco product standards and manufacturing standards. So, there is, I mean, there are there is an adjudicate. I mean, of course, FDA has the ability to adjudicate these applications, but that authority is very much connected in the statute. Arguably to the requirement for will make. There's certainly overlap and that's because the way products are manufactured and have effects on their on the public health and the health risks to users and the potential benefits. So there's certainly going to be some overlap. But we think the statute still requires FDA to decide these and to deny them when they don't make the bottom line statutory public health showing in the act. Thank you. Thank you. Thank you, your honors. I thought I would start with with the government's pointing out that the reconsideration or supervisory review denial address a memo from the special counsel's office regarding one of the letters under review. Supreme court in locomotive engineer said it's the formal disposition that matters of the agency order. You don't sort of read between the lines to see. See, was the agency in fact, doing reconsideration? It's the formal disposition, but I would know that even if the agency did affect for limited reopening for that limited purpose, it would still be a mixed order. That is almost entirely denying reconsideration and addressing that 1 specific new issue. And under this court's presence, I'd point you to the postal regulatory commission 841 after 509. The part that's addressing the record that was before the agency before remains on reviewable, even if that small little sliver. Is then subject to review in that case for abuse of discretion. We are not raising any challenge to the agency's consideration of the memo just special. I think it's just, I think it's just irrelevant in this case. I understand why the agency wants to get supervisory review denial in it because they are the, the agency actually did say that they're independent grounds for decision. But even taking that on its own terms, it's entirely unexplained. They just asserted they asserted 7 times, but they never explained why that would be an independent ground. Why be independently sufficient to tip the balancing test that the agency when it benefits the agency purports to be applying in order to discount benefits. But if it sees a flaw, then all of a sudden, you know, it's no longer balancing. I don't think the court should accept that rationale. Judge Walker, you were focused on deficiency for again, I said, I submit that changes to product design should be set out in manufacturing regulations. So, if you agree with us on that, I don't think you need to get to the issue that you were concerned about, about whether that 1 document reported to give us notice for public health purposes. And just in terms of the structural argument that you were talking to my friend on the other side about. And judge Ginsburg, you raised this earlier. I do not read. I do not do not hear the government to be walking away from the argument that it is free to pick and choose between the manufacturing prong and the public health. And the case was abundantly clear. It can't do that. In addition to that, I don't think you said that. I think they're saying they're distinguishing between a violation of the manufacturing standard. And a failure to provide information, but you're out of the whole point of the manufacturing regulations as it's telling you the sort of information you need to collect. It's that that is about processes and controls and requirements. For documenting for documenting conditions for documenting the specifications of your product and testing against them to see if they deviate. The medical device regulations are just replete with all of these kind of requirements, which the FDA flushes out on a product specific basis. Um, with guys, and so if FDA had put those regulations in place and had appropriate guidance, we would have known, for example, to monitor the humidity in various rooms in our manufacturing facility. But we didn't until the denial. So, but I, I, I understand the government to be saying, you can pick and choose and the sports already made clear genius that FDA is not allowed to do that. Is it part of your case that the government that the FDA was. Required and failed to issue regulations. Yes, I mean, it was, it was going to deny us for, um, or issues that properly fall within the manufacturing problem within be, it was required to prolongate regulations. And should we remand this case? And so for them to issue their regulations. You should vacate and remand this case and that purpose. So, so they can hold it and so they get regulations. I think it is sufficient for you to vacate and remand this case saying that the agency applied the incorrect legal standard and considered factors that Congress did not. Did not allow it to consider. The agency on remand can then decide, do we want to try and deny on manufacturing grounds again? In which case it couldn't do it until it issued a manufacturing regulation. Or if it's claiming to you here that these other grounds were truly independent, it could try and deny us on those grounds with proper reasoning that we would then be able to challenge in court. As arbitration take a couple of years to get regulations. I will note that FDA has denied thousands of applications for and as far as I know, we are the only application where it purported to address these kind of manufacturing issues. So I don't think it's going to create a big problem in the sense that you might be worried about. Is product design. Same thing as the methods used in the manufacturer processing or packing. Yes, design controls are are are embedded within the manufacturing provision. In fact. Congress specifically went to FDA specifically went to Congress to have the ability to impose design controls added to the medical device provision. So now those provisions overlap. But, yes, the, the sort of things your product needs to be able to do the specifications. How do you test against that are manufacturing? It sounds more like a product. Stan, I, I, I think there, I think there, I think there is some overlap between those, but FDA didn't do either here. So. Don't really have an opportunity. I mean, the FDA admittedly can try and distinguish, but some, you know, some meat on the bones of those 2 things and flesh it out with a reason decision, but we just don't have. Thank you. I appreciate it. The case is submitted.
judges: Rao, Walker, Ginsburg